******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE JACKLYN H. ET AL.*
(AC 37746)

Sheldon, Keller and Sullivan, Js.

*Argued September 11, 2015—officially released February 2, 2016*

(Appeal from Superior Court, judicial district of

Litchfield, Juvenile Matters at Torrington, Ginocchio, J.)

*Joshua Michtom*, assistant public defender, for the appellant (respondent father).

*Jane R. Rosenberg*, assistant attorney general, with whom, on the brief, was *George Jepsen*, attorney general for the appellee (intervenor Judicial Branch).

*Opinion*

KELLER, J. This appeal requires us to wander into the thicket of statutory provisions affecting the disclosure of privileged medical communications and records, particularly those pertaining to an individual's mental health. On May 15, 2014, the Commissioner of Children and Families (petitioner) filed neglect petitions on behalf of the minor children of the respondent father, Thomas H. (respondent). Two of his children, Jacklyn H. and Jillian H., were adjudicated neglected after both of the respondent parents pleaded nolo contendere to one of the grounds alleged for neglect. Thereafter, the children were committed to the custody of the petitioner on February 25, 2015. The respondent appeals from a postjudgment order of the trial court, *Ginocchio*, *J.*, denying his revised motion for order seeking the return or destruction of copies of a court-ordered psychological evaluation report that the Judicial Branch released to a juvenile probation officer in response to her e-mail request, after the clerk of the court determined the release was authorized by General Statutes § 46b-124 (b) (1) (E).[1] On appeal, the respondent makes the following claims: (1) the trial court's application of § 46b-124 (b) (1) (E) was erroneous because it violated the constitutional privacy rights of the respondent and his children; and (2) the trial court's application of § 46b-124 (b) (1) (E) was erroneous because the statute, when read in conjunction with other statutes, does not provide for unlimited access to a court-ordered psychological evaluation report by an employee of the juvenile probation department without prior notice and a hearing. We agree with the respondent's second claim. This conclusion renders it unnecessary to reach the first claim. Accordingly, we reverse the judgment of the trial court and remand the case for a hearing consistent with this opinion on the respondent's revised motion for order.

The following procedural history is relevant to the present appeal. On May 15, 2014, pursuant to General Statutes § 46b-129, the petitioner filed neglect petitions on behalf of three of the respondent's minor children: Jacklyn, Jillian, and Joshua.[2] In the petitions on behalf of Jacklyn and Jillian, then aged eight and nine, respectively, the petitioner claimed that the minor children were being denied proper care and attention physically, educationally, emotionally, or morally, and that they were being permitted to live under conditions, circumstances, or associations that were injurious to their well-being. Further, the petitioner alleged that the respondent mother and father both had mental health issues that they were not addressing, which contributed to the alleged neglect of their minor children.[3] On July 16, 2014, the court, *Gallagher*, *J.*, granted the petitioner's motion to consolidate the May 15, 2014 child neglect proceedings with all "child custody matters" arising

from the respondent parents' pending dissolution action.[4] On that same date, the court issued a bench order of temporary custody for both Jacklyn and Jillian. On July 22, 2014, the court sustained the order of temporary custody.

On July 16, 2014, the court, *Gallagher*, *J.*, pursuant to its authority under General Statutes §§ 46b-129 (i) and 46b-129a, as well as Practice Book § 34a-21, granted the oral motions of the petitioner and the children's guardian ad litem for a psychological evaluation. On October 7, 2014, the court, *Ginocchio*, *J.*, supplemented Judge Gallagher's order and issued a more detailed written order for a psychological evaluation of the respondent mother, the respondent, Jacklyn, Jillian, and the respondents' two sons, Joshua and Justin.[5] The court indicated in its written order that the evaluation report was to include information pertaining to: (1) the current psychological functioning of each child and any emotional, cognitive, or social problems that should be addressed through treatment; (2) the current psychological functioning of each parent, including whether they required treatment for substance abuse, domestic violence, or mental illness; (3) the nature of the relationship between the children and each individual parent; (4) the capacity of each parent to understand and meet each child's needs; (5) the psychologist's recommendations as to permanent placement options and assistance with co-parenting; and (6) the nature of the relationship between each parent and the effect that it had on the children.

The court also ordered that, "[t]o request education, medical, mental health or other relevant information the parent or guardian must complete the Authorization for Release of Information form (JD-CL-46).[6] The completed authorization must be attached to this referral." (Footnote added.) At the bottom of the second page of the psychological evaluation order, above where the judge placed his signature, the order stated, "Copies of the evaluation report shall be distributed upon receipt to all parties. Any communication to the evaluator(s) before the completion and filing of the evaluation report must be in accordance with Section 34a-21 of the Connecticut Practice Book. Evaluation reports and portions of the reports are confidential and may not be further disclosed without a Court Order." Above this statement on the form that was completed in the present case, proposed contacts from an educational setting, mental health providers, and medical providers were listed with their contact information. Specifically, the names of a school social worker and a school principal, three therapists, a pediatrician, and an obstetrician were listed there.

Pursuant to the court's order, a licensed clinical psychologist, Suzanne Ciaramella (evaluator), conducted a psychological evaluation over a four day period and

compiled the results in a seventy-nine page report. The evaluation report was filed with the trial court on December 3, 2014. Prior to the commencement of her evaluation, the evaluator noted in her report that "Mother and father gave their informed consent for this court-ordered evaluation after the evaluator and parents reviewed reasons for the ordered evaluation, their understanding of the reasons for the evaluation, the role of the evaluator, the limits of confidentiality and ultimately, their choice to either consent or refuse participation. Parents also gave their informed consent for the children to participate and although Joshua and Justin were requested to participate, they did not, save for Joshua participating in the interactional assessment with mother. Parents were also made aware that results of this evaluation will be used to guide the Superior Court for Juvenile Matters in Torrington, CT, in assisting the entire family with any identified needs and determining what would be in the best interests of the children."

The evaluator interviewed the respondents and each of the girls extensively, and conducted psychological testing on all of them. She also contacted numerous individuals who had provided educational, mental health, and other services to the family, including a school principal, a person identified as Jillian's therapist, the respondent's therapist, two parenting educators, one of whom the evaluator referred to as a clinician, and a member of a caregiver support team working with the two girls and their grandparents, who had not been ordered to participate in the evaluation. The evaluator's communications with these contact persons were discussed at great length in the evaluation report. The evaluator indicated that she was unable to contact the pediatrician or the respondent mother's gynecologist, as well as one of the persons listed as a collateral contact on the court's order. Four of the persons whom the evaluator contacted and from whom she obtained detailed information set forth in the evaluation report were not on the list of contacts contained in the court order for the evaluation. At the end of the evaluation report, the evaluator answered the court's specific referral questions and opined on whether proposed beneficial services should be utilized, including further mental health treatment.

During the pendency of the child neglect proceedings and after the evaluation report had been filed with the court, Jacklyn was charged with a delinquency offense. On January 15, 2015, after Jacklyn's delinquency case was referred to the office of juvenile probation for non-judicial handling,[7] the juvenile probation officer who was assigned to the case requested the evaluation report by sending an e-mail to the clerk of the court.[8] Relying on § 46b-124 (b) (1) (E), the clerk provided copies of the evaluation report to the juvenile probation officer on the same day. The clerk thereafter sent an e-mail to

all counsel of record in the neglect proceedings, notifying them of the completed disclosure. Upon learning of the clerk's disclosure of the evaluation report, counsel for the respondent filed a motion for order with the court on January 22, 2015, claiming that both the respondent's interests and his minor children's interests had been harmed by the disclosure.

In addition to requesting a hearing with regard to the respondent's motion, counsel for the respondent "move[d] [the] court to order the office of probation to return or destroy all copies of [the] . . . evaluation [report] that [were] provided to them from the court file . . . ." On January 29, 2015, counsel for the respondent filed a revised motion for order and a memorandum of law in support of the motion. In this revised motion, the respondent sought "a hearing on [his] claims, injunctive relief in the form of destruction and/ or return of the records at issue, and a declaratory judgment that child protection records generated in this case shall be released to nonparties only . . . upon order of the court upon a demonstration of necessity."

On February 4, 2015, the court, *Ginocchio*, *J.*, held a hearing on the respondent's motion. At the hearing, counsel for the respondent, counsel for the respondent mother, and counsel for the minor children argued, inter alia, that the disclosure of the evaluation report to the juvenile probation officer without prior notice and a hearing had violated the respondents' and the children's constitutional and statutory rights to privacy. The court denied the respondent's motion from the bench and concluded that § 46b-124 (b) (1) (E) permitted the clerk's disclosure of the evaluation report to the juvenile probation officer without the need for a court order.[9]

In issuing its ruling from the bench, the court stated the following as its reasoning in denying the respondent's motion with respect to § 46b-124 (b) (1) (E): "[T]here's nothing in the statute that says that you can— once the evaluation is done, it doesn't give the court the right to start sorting out different sections and saying that this should go or should not go to the appropriate agency. . . . If they're ordered by the court and they applied to the children, those exams, they're subject to the statutory scheme as stated in § 46b-124, so I think it gets turned over to the various agencies. There's nothing in that statute that says—what would be the reason for not turning it over to the appropriate agency according to the statutory scheme? There would be none. . . . [I]mplicit in [the office of juvenile probation's] request is that they required it for some reason. . . . They don't have to show good cause or anything more than that . . . ." This appeal followed.[10] Additional facts and procedural history will be set forth as necessary.

We begin our analysis by setting forth the appropriate

standard of review. The issue before us is whether the respondent, on behalf of himself and his children, waived the statutorily protected confidentiality of their mental health records under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C. § 1320d et seq., or Connecticut privilege statutes such that the trial court had no gatekeeping function prior to disclosing the evaluation report to the juvenile probation officer as a court record pursuant to § 46b-124 (b) (1) (E).[11] Our review of the court's interpretation of § 46b-124, its application to the facts of this case, and its interrelation with federal and state statutes that protect the confidentiality of private health information is plenary, as this inquiry presents questions of law. See *State* v. *Kemah*, 289 Conn. 411, 420–21, 957 A.2d 852 (2008) (review of court's interpretation of General Statutes §§ 52-146d and 52-146e is plenary); *In re William H.*, 88 Conn. App. 511, 517–18, 870 A.2d 1102 (2005) (review of court's interpretation of § 46b-124 and its application to facts of case is plenary).

"It . . . is well established that we are required to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we are mindful that the legislature is presumed to have intended a just and rational result." (Internal quotation marks omitted.) *Teresa T.* v. *Ragaglia*, 272 Conn. 734, 748, 865 A.2d 428 (2005); accord *Blum* v. *Blum*, 109 Conn. App. 316, 322, 951 A.2d 587, cert. denied, 289 Conn. 929, 958 A.2d 157 (2008); *Gervais* v. *Gervais*, 91 Conn. App. 840, 855, 882 A.2d 731, cert. denied, 276 Conn. 919, 888 A.2d 88 (2005). "[W]e look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction." (Internal quotation marks omitted.) *State* v. *B.B.*, 300 Conn. 748, 757, 17 A.3d 30 (2011). "[I]t is a well-settled principle of construction that specific terms covering the given subject matter will prevail over general language of the same or another statute which might otherwise prove controlling. . . . The provisions of one statute which specifically focus on a particular problem will always, in the absence of express contrary legislative intent, be held to prevail over provisions of a different statute more general in its coverage." (Internal quotation marks omitted.) *Tappin* v. *Homecomings Financial Network, Inc.*, 265 Conn. 741, 760, 830 A.2d 711 (2003), quoting *Moscone* v. *Manson*, 185 Conn. 124, 133–34, 440 A.2d 848 (1981).

The respondent's second claim centers on the application of exceptions enumerated in § 46b-124 (b) (1) (E),[12] that permit disclosure, without a court order, of otherwise confidential records used by the court in nondelinquency juvenile cases. The issue raised is whether the court's application of § 46b-124 (b) (1) (E) in this case, without prior notice and a hearing, amounted to reversible error insofar as the trial court's

affirmation of the clerk's disclosure of the evaluation report to the juvenile probation officer impermissibly conflicted both with its own order[13] as well as with other laws that prevented further disclosure of the evaluation report absent the respondent's consent. The respondent asserts that § 46b-124 (b) (1) (E), when read in conjunction with other state and federal statutes that more specifically protect the privacy of health treatment records, should not be interpreted to provide for unlimited access to privileged information contained in an evaluation report to the entities and individuals that the statute exempts from the need to seek a court order, such as an employee of the juvenile probation department.

Our Supreme Court historically has been cautious in determining whether the disclosure of information protected by state statutes providing a privilege for confidential communications and records should occur, even in the context of another court proceeding. In *Falco* v. *Institute of Living*, 254 Conn. 321, 328, 757 A.2d 571 (2000), the court, in considering the scope of the psychiatrist-patient privilege contained in § 52-146e, noted that "the principal purpose of [the psychiatrist-patient] privilege is to give the patient an incentive to make full disclosure to a physician in order to obtain effective treatment free from the embarrassment and invasion of privacy which could result from a doctor's testimony. . . . Accordingly, the exceptions to the general rule of nondisclosure of communications between psychiatrist and patient were drafted narrowly to ensure that the confidentiality of such communications would be protected unless important countervailing considerations required their disclosure. See, e.g., 9 H.R. Proc., Pt. 8, 1961 Sess., p. 3945, remarks of Representative Nicholas B. Eddy (statutory scheme defines the protected relationship carefully and at the same time recognizes the legitimate interest of society in intruding upon the relationship *in certain limited situations*) . . . ." (Citation omitted; emphasis in original; internal quotation marks omitted.) Therefore, the court concluded that a trial court cannot exercise its discretion to override the psychiatrist-patient privilege where the court discerned compelling countervailing interests not explicitly delineated in the narrowly limited exceptions to nondisclosure contained in General Statutes § 52-146f: "It is just as clear that no exception is available beyond those contained in § 52-146f. [W]e have long held that . . . exceptions to statutes are to be strictly construed with doubts resolved in favor of the general rule rather than the exception . . . . [W]here express exceptions are made, the legal presumption is that the legislature did not intend to save other cases from the operation of the statute." (Internal quotation marks omitted.) *Falco* v. *Institute of Living*, supra, 330; see also *State* v. *Jenkins*, 271 Conn. 165, 181–83, 856 A.2d 383 (2004) (because no exception available beyond

those contained in § 52-146f, trial court improperly allowed state access to, and use of, defendant's mental health records to rebut defense of intoxication).

*State* v. *Kemah*, supra, 289 Conn. 411, also is instructive. In that case, a complainant in a criminal case consented to the release of her confidential mental health information to the police and prosecuting authorities, and defense counsel, based solely on that limited consent, moved for disclosure and production of her mental health records to the defendant, claiming they were necessary to protect his right to prepare a defense and that the complainant had waived confidentiality. Id., 416–17. The trial court granted the defendant's motion, ruling that because the complainant had turned over her confidential or privileged records to the prosecutor's office, there was no longer any initial gatekeeping role for the court, and the records should be disclosed to the defendant. Id., 418. Our Supreme Court held that "we have construed waivers narrowly and have declined to imply a complete waiver of privilege from a waiver as to particular matters or as to disclosure to certain persons." Id., 426. The complainant expressly had limited disclosure in each of three releases she had signed to a single identified party, and "[t]here was no evidence that [she had] intended a broader waiver than the express terms of the releases had indicated." Id., 434.

The people of this state enjoy broad privileges, with limited exceptions, not only in psychiatric communications and records, but also in communications and records shared between psychologist and patient; General Statutes § 52-146c; patient communications to, or information obtained by, a physician, surgeon, or licensed health care provider; General Statutes § 52-146o; privileged communications between a marital and family therapist and a person consulting such therapist; General Statutes § 52-146p; confidential communications between a licensed clinical social worker and a person consulting such social worker; General Statutes § 52-146q; and confidential information shared between a professional counselor and a person consulting such professional counselor. General Statutes § 52-146s.[14] We observe that all of these enumerated statutory privileges and the protections that they provide, with limited but not identical exceptions,[15] may be implicated in the present case, as the evaluator, a psychologist, indicated that she had collateral contacts with therapists and parenting educators without designating their exact professional capacities. Specifically, the record is not clear as to whether any of these collateral contacts was a clinical social worker, psychologist, professional counselor, or "a person participating under the supervision of a psychiatrist in the accomplishment of the objectives of diagnosis and treatment," as described in § 52-146d (2).

More significantly, the psychologist-patient privilege statute specifically restricts the use of court-ordered psychological evaluations. Pursuant to § 52-146c (c) (1), the consent of the person consulting the psychologist is not required for the disclosure of that person's communications "[i]f a judge finds that any person after having been informed that the communications would not be privileged, has made the communications to a psychologist in the course of a psychological examination ordered by the court . . . ." The communications made to the psychologist, however, are "admissible only on issues involving the person's psychological condition . . . ." General Statutes § 52-146c (c) (1). This latter statutory exception provides that the psychological evaluation report is subject to disclosure only when offered as an evidentiary submission in a trial proceeding involving the issue of the subject's psychological condition. Thus, providing the court-ordered evaluation report to a juvenile probation officer would not be encompassed by this exception. Even within the context of the neglect proceedings in the present case, the evaluation report was never admitted into evidence, as the matter proceeded to judgments committing the children to the petitioner without a trial.[16]

Previously, we noted the distinction between privileged and confidential information. Although § 46b-124 (b) (1) (E) governs the release of juvenile records used by the court that are otherwise confidential pursuant to § 46b-124 (b), the statute does not precisely address the release of privileged information that may be contained within such confidential juvenile records.

The Judicial Branch argues that the psychologist-patient privilege and HIPAA do not apply to the disclosure of the evaluation report at issue and have no bearing on the construction of § 46b-124 (b). We disagree. In *Bieluch* v. *Bieluch*, 190 Conn. 813, 814–15, 462 A.2d 1060 (1983), cited by the Judicial Branch, a father contesting his children's custody in a divorce proceeding argued that a psychiatrist who had conducted a psychiatric evaluation of him and his children ordered by the dissolution court could not testify in the proceedings for which the evaluation was ordered. Our Supreme Court held in that case that the father had failed to establish that his communications with the psychiatrist conducting the evaluation were privileged. See id., 816–20. Unlike the present case, *Bieluch* did not involve the disclosure of privileged communications relating to professionals consulted by the father for diagnosis and treatment; this case does involve such disclosure because disclosures provided to the evaluator from professionals treating the respondent and his children are referenced in her evaluation report. Furthermore, even if we only were dealing with the disclosure of communications made by the participants to the evaluator, § 52-146 (c) (1) limits disclosure to admissibility in the pro-

ceedings for which the evaluation was ordered.[17]

Apart from § 52-146c (c) (1), which governs the disclosure of communications made to an evaluator acting under authority of a court, other statutes creating protection for communications and records related to treatment and diagnosis specifically govern the further disclosure of a subset of information that may become part of the court record and may be beneficial to the court, namely, privileged communications. When privileged information is contained in a record provided to the juvenile court, the means by which consent to the disclosure of that information was obtained, including representations made to the participants and the nature of the order that they participate, may limit the otherwise broad and general disclosures of confidential court records permitted under § 46b-124 (b) (1) (E). Indeed, the language in the form used by the Judicial Branch for securing the performance of a court-ordered psychological evaluation appears to recognize this distinction and automatically provides for further court consideration before such highly sensitive information is disseminated beyond the parameters of the proceeding in which its disclosure is ordered, and beyond the eyes of the court, counsel, and the parties. Clearly, the complicated parameters surrounding the disclosure of certain types of privileged or confidential communications specifically shielded from disclosure absent certain delineated circumstances in our privilege statutes or in HIPAA—as compared to the more generalized reference to "court records" in § 46b-124 (a)—demand additional and cautious court scrutiny. "[Any] determination whether the disclosure provisions of [§ 46b-124 (b) (E)] override state and federal confidentiality laws is a highly fact-dependent inquiry that cannot be answered definitively in the absence of a specific factual scenario. In each case, whether any particular [privilege or] confidentiality law applies will depend on the precise nature of the records at issue, how they were created, and the nature of the entity that is holding them." Opinions, Conn. Atty. Gen. No. 2009-012 (November 20, 2009) p. 3.

We do not agree with the Judicial Branch's argument that the Judicial Branch form signed by the court in the present case, which prevented further release of the evaluation report without a further court order, should be construed as exempting from the necessity of a court order those disclosures specified in § 46b-124 (b) (1) (E). The construction of an order is a question of law for the court, and the court's review is plenary. *State* v. *Denya*, 294 Conn. 516, 529, 986 A.2d 260 (2010). "As a general rule, [orders and] judgments are to be construed in the same fashion as other written instruments." (Internal quotation marks omitted.) Id. The legal effect of an order "must be declared in light of the literal meaning of the language used. The unambiguous terms of [an order], like the terms in a written contract, are to be given their usual and ordinary meaning. . . .

[An order] must be construed in light of the situation of the court, what was before it, and the accompanying circumstances." (Footnotes omitted.) 46 Am. Jur. 2d 447, Judgments § 74 (2006).

The plain and unambiguous language of this particular order prohibiting disclosure of the evaluation report to third parties without court approval, which appears on a Judicial Branch official form, essentially sealed the evaluation report from dissemination to anyone other than the court and the parties. Sealing orders are contemplated and permitted under § 46b-124 (j), which states in relevant part, "Nothing in this section shall be construed to prohibit a party from making a timely objection to the admissibility of evidence consisting of records of cases of juvenile matters, or any part thereof, in any Superior Court . . . proceeding, or from making a timely motion to seal any such record pursuant to the rules of the Superior Court . . . ." We do not find persuasive the argument that a more protective approach to the release of an evaluation report necessarily undermines or contravenes the legislative intent of § 46b-124 (b) to facilitate communication among officials and entities providing services to the same child. See 38 H.R. Proc., Pt. 8, 1995 Sess., pp. 2938–39, remarks of Representative Michael P. Lawlor. A great deal of information used by the court and contained in juvenile court files, such as Department of Children and Families social studies, is not as shielded as private health information is by other applicable state and federal law, but it still can be readily obtained.

The evaluation report in the present case contains information disclosed to the evaluator by the participants, as well as the results of testing that she performed on them. It also contains privileged mental health information derived from sources other than the evaluator's own interviews and personal observations of her subjects. As we noted previously, the court's evaluation order stated that, "[t]o request education, medical, mental health or other relevant information the parent or guardian must complete the Authorization for Release of Information form (JD-CL-46). The completed authorization must be attached to this referral." Furthermore, the evaluator, prior to the commencement of her evaluation, ascertained the respondent's and the respondent mother's understanding of the reasons for the evaluation and advised them of the reasons for the ordered evaluation, the role of the evaluator, the limits of confidentiality, and, ultimately, their choice to either consent to or refuse participation. Both respondents were made aware that the results of the evaluation would be used to guide the court "in assisting the entire family with any identified needs and determining what would be in the best interests of the children."[18] The respondents also gave their similarly informed consent for their minor children to participate. The evaluator contacted numerous individuals who had provided educational,

mental health, and other services to the family; these included a school principal, a person identified as Jillian's therapist, the respondent's therapist, two parenting educators (one of whom the evaluator referred to as a clinician) and a member of a caregiver support team working with the two girls and their grandparents (who had not been ordered to participate in the evaluation). We reiterate that four of the persons whom the evaluator contacted, and from whom she obtained information noted in detail in the evaluation report, were not on the list of contacts contained in the court order for the evaluation.

From a public policy perspective, parents and their children who are ordered to submit to court-ordered psychological or psychiatric evaluations still must sign written consents authorizing the evaluator to communicate with their mental health and other medical providers. As a second layer of protection, the parties in this case were advised by the evaluator that they would give up significant rights by participating in the evaluation. In reality, each party has the full right and authority to refuse to participate in the evaluation pursuant to his or her statutory privacy rights as well as the right to remain silent in juvenile neglect proceedings under General Statutes § 46b-137 (d). As a result of the rights being waived, it is not incomprehensible that certain assurances may have to be provided to the parties to persuade them to participate and cooperate. There is a public policy interest in ensuring a high rate of participation in evaluations, as the assessment by a professional may properly be accorded great weight by the trial court in determining whether a parent's mental deficiency interferes with the parenting functions necessary to deal effectively with a child. See *In re Nicolina T.*, 9 Conn. App. 598, 605, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987). If a parent's consent to participate in an evaluation is premised on an understanding that its use and dissemination is narrowly restricted only to those involved in the child protection proceeding and that representation later proves to be untrue, it will be increasingly unlikely that voluntary participation will occur, and judges, counsel, and service providers such as the Department of Children and Families will have less access to this necessary information.

Accordingly, we conclude that with respect to private and sensitive health information, a just and rational result in reconciling highly protective state and federal statutes with the disclosure provisions in § 46b-124 (b) pertaining to confidential records for the use of the court in juvenile matters requires that the statutes be read together and construed harmoniously in order to render an overall reasonable result. See *Blum* v. *Blum*, supra, 109 Conn. App. 322. Like the trial court in *State* v. *Kemah*, supra, 289 Conn. 418, the court in the present case determined that it no longer had any gatekeeping

function with respect to the release of the evaluation report and failed to consider the precise content of the releases used to waive any privileges or any other assurances relayed to the respondents to induce them to consent to any waivers for purposes of the evaluation. Although the record presented on appeal is insufficient for us to conclude whether the disclosure of the evaluation report conflicted with the requirements of any applicable privilege statutes or HIPAA, as claimed by the respondent,[19] the record is sufficient to conclude that the court, by virtue of its initial order prohibiting disclosure to third parties and the narrow exception provided for disclosure of court-ordered psychological evaluation reports in § 52-146c (c) (1), should have provided the respondent with a hearing in which he would have been able to assert, for the court's consideration, his concerns about the nature and the extent of the disclosures to which he may have agreed on behalf of himself and his minor children. The purpose of a hearing would have been to ascertain the scope of the explanation provided to the respondent to obtain his informed consent to the evaluation and whether the releases, if any, provided to the evaluator by the respondent for contacting the individuals with whom she conferred as part of her evaluation fully informed the respondent of the potential for an unrestricted disclosure of the evaluation report, or any part of it, to the juvenile probation officer without further court order.[20] The court also should have examined the precise content of any releases the respondent signed, before and after the order for the evaluation was issued, and determined whether they were HIPAA compliant,[21] and whether they permitted all, part, or none of the evaluation report to be disclosed to the juvenile probation officer without the respondent's further consent or a court order.[22] If the official Judicial Branch release form was employed, it might have supported the respondent's argument that absent a further court order, the dissemination of all or some of the information contained in this psychological evaluation report was limited only to use in the neglect proceedings.

Given that the court's own order, on an official Judicial Branch form, contemplated a judicial determination as to whether a nonconsensual disclosure of all or part of the evaluation report to third parties should occur, we conclude that the trial court erred by not providing the respondent a full hearing concerning his claim that his and his children's privacy interests were being violated by the disclosure and by allowing the juvenile probation officer to retain the copies of the evaluation report provided to her by the clerk.[23]

We recognize that the seminal 1995 amendments to § 46b-124, which created the statutory disclosure exception at issue in this appeal, were the result of the legislature's focus on increasing efficiency within the juvenile criminal justice system by eliminating the obstacles

arising from confidentiality barriers within the system. See 38 H.R. Proc., supra, pp. 2938–39, remarks of Representative Lawlor. Nevertheless, we are mindful of the strong presumption of privacy in an individual's health records stemming from our statutory privileges and HIPAA. Permitting a Judicial Branch employee to ascertain the nature of, for example, the disposition in a child protection case is a far cry from the invasiveness of providing that same employee with a seventy-nine page document containing highly sensitive and potentially damaging information that concerned not only the accused delinquent child, but also other members of her family.

Furthermore, Connecticut courts, both before and after the 1995 amendments, consistently have acknowledged the need to assess carefully the nature of information contained within confidential records in juvenile proceedings before permitting their disclosure to various parties. See *In re Sheldon G.*, 216 Conn. 563, 582–83, 583 A.2d 112 (1990) ("[w]e . . . conclude . . . that it is appropriate to consider the nature of the information generally contained in juvenile records for the limited purpose of determining whether the confidentiality of such records should survive"); see also id., 584 ("The present language and structure of § 46b-124 reflect the legislature's frequent reconsideration of the competing interests involved in protecting the confidentiality of records regarding juveniles who have caused harm to others. . . . Although the court has some residual discretion to order disclosure of records in circumstances not precisely addressed by the statute, its discretion must be informed by the policies that the statute is intended to advance."); *In re Amy H.*, 56 Conn. App. 55, 62–65, 742 A.2d 372 (1999) (trial court abused discretion by ordering copy of memorandum of decision to be attached to any request by foster parents for restraining order preventing respondent father from contacting them, their children, or his own child where memorandum of decision contained highly personal, confidential information about psychological conditions of respondent father, respondent mother, and family members); *In re Marvin M.*, 48 Conn. App. 563, 571, 711 A.2d 756 ("[a]lthough this determination has never been made by this court, case law from other jurisdictions on the subject supports the view that courts must distinguish, as a threshold matter, between confidential and nonconfidential communications" [footnotes omitted]), cert. denied, 245 Conn. 916, 719 A.2d 900 (1998); *In re Romance M.*, 30 Conn. App. 839, 854–57, 622 A.2d 1047 (1993) (trial court did not abuse discretion in weighing federal statutory criteria in deciding to admit respondent mother's alcohol rehabilitation records in termination of parental rights proceeding), appeal dismissed, 229 Conn. 345, 641 A.2d 378 (1994); *In re James C.*, Superior Court, judicial district of Waterbury, Juvenile Matters, Docket Nos. U06-CP-10007295-A, U06-CP-

10007296-A (*Rubinow, J.*) (December 6, 2011) ("Here, in determining whether this court should use its discretion to allow [the Department of Criminal Justice] access to the confidential juvenile court file, the court has applied the relevant principles established by *In re Sheldon G.*, supra [563], and as applied [in] *In re Amy H.*, supra [55]. Those principles include use of the 'compelling need' test, attention to the nature of the information contained in the juvenile court file, and the requisite focus upon the anticipated civil, administrative and personnel purposes for which the [Department of Criminal Justice] seeks to have [children's] family records produced.").

In light of the array of resources that Judicial Branch employees have at their disposal and the varied, sensitive information contained within documents like the evaluation report in this case, we conclude that the court was required to conduct a hearing prior to the disclosure of the evaluation report to the juvenile probation officer. We note that, upon remand, the trial court will be required to ascertain whether, and to what extent, the respondent consented to the disclosure to third parties of his and his children's health information, or similar disclosure of the evaluation report itself. If the court determines that all or part of the evaluation report should not have been disclosed to the juvenile probation officer, it should order any and all copies in the possession of the probation officer or her department redacted, returned to the child protection file, or destroyed.

The judgment is reversed and the case is remanded for a further hearing consistent with this opinion on the respondent's revised motion for order.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

[1] Although Kathleen H., the respondent mother, has not filed an appeal, she joined in the respondent's motion to the trial court seeking that the evaluation report be returned from the Judicial Branch or destroyed, and pursuant to Practice Book § 67-13, she was permitted, as an appellee who supports the position of the appellant, to adopt the brief and supplemental brief of the respondent.

[2] The petition alleging the neglect of Joshua was withdrawn on October 27, 2014, after he attained the age of majority.

[3] Specifically, the jurisdictional facts sections of the neglect petitions stated: "To wit: 1. Mother has mental health issues that are not adequately addressed. 2. Father has unresolved mental health issues. 3. Mother and Father are neglecting their children in that they have refused to comply with recommended mental health services. 4. Mother and Father fail to protect their children from their verbal and physical altercations."

[4] The consolidation was sought to avoid potentially conflicting orders as to the care and custody of the children being issued by two different courts. Despite the consolidation, however, the record does not include the entire family court file, only excerpts from it. Furthermore, the record does not include any indication as to whether the juvenile court entered orders pertaining to the children's custody in the dissolution matter. We therefore are unable to ascertain whether the evaluation report also was intended for use in the custody determination in the dissolution proceeding, which would

create another problematic layer regarding the disclosure issue in the present appeal. Although § 46b-124 (b) (1) (E) does not pertain to family court records, Practice Book § 25-60 (b) appears to limit the disclosure of court-ordered private evaluation reports in family cases. It provides, in pertinent part, that a court-ordered private evaluation report compiled by a state licensed mental health professional of any party or any child in a family proceeding "shall be filed with the clerk, who will seal such report, and shall be provided by the filer to counsel of record, guardians ad litem and self-represented parties unless otherwise ordered by the judicial authority. . . ."

[5] As of the date on which the psychological evaluation was concluded, Joshua and Justin both were adults. Neither of them was individually assessed, although Joshua, three days before he became eighteen years old, did participate in an interactional assessment with his mother and his two sisters. Judge Gallagher had indicated on July 16, 2014, that the then seventeen year old Joshua only needed to participate in the psychological evaluation if he was willing to do so.

[6] This is an official Judicial Branch form titled, "Authorization for Information," available at http://www.jud.ct.gov/webforms/forms/cl046.pdf (last visited January 19, 2016) (copy contained in the file of this case in the Appellate Court clerk's office). It contains itemized criteria that would provide for either a very limited, or a more expansive receipt of confidential information. It also states that "[t]his request is being made at the request of the individual for purposes related to the case identified in this section which may include, but not be limited to, court ordered investigation or evaluation, supervision and mediation or negotiation." It also indicates to the person signing the authorization, on page 2, in explaining the section captioned, "Statement of Authorization," that "[y]ou give permission to give this information and if it is for use in a court case, this information, including any sensitive information checked in Section 4 [which pertains, inter alia, to health records involving mental health and substance abuse], may be looked at by the Court by the parties to the case, by attorneys in this case, and by any appointed Guardian Ad litem. They must not give this information to anyone else except they can give out non-sensitive health information for legitimate trial and trial preparation purposes having to do with this case." The form also requires that the person signing indicate a "date, event or condition on which your permission ends, which can be no later than the final disposition of the case."

[7] The statute governing nonjudicial handling of juvenile matters, General Statutes § 46b-128 (a), provides in relevant part: "Whenever the Superior Court is in receipt of any written complaint filed by any person, any public or private agency or any federal, state, city or town department maintaining that a child's conduct constitutes delinquency within the meaning of section 46b-120, it shall make a preliminary investigation to determine whether the facts, if true, would be sufficient to be a juvenile matter and whether the interests of the public or the child require that further action be taken. If so, the court may authorize the filing of a verified petition of alleged delinquency or it may make without such petition whatever nonjudicial disposition is practicable . . . provided the facts establishing jurisdiction are admitted and that a competent acceptance of such a disposition has been given by the child and his parent or guardian. If a nonjudicial disposition is made, the term of any nonjudicial supervision shall be established by the juvenile probation supervisor provided such period of supervision shall not exceed one hundred eighty days. . . ."

Practice Book § 27-1A (c) provides that "[d]elinquency matters eligible for nonjudicial handling shall be designated as such on the docket. If the prosecuting authority objects to the designation, the judicial authority shall determine if such designation is appropriate. The judicial authority may [also] refer to the office of juvenile probation a matter so designated and may, sua sponte, refer a [delinquency] matter for nonjudicial handling prior to adjudication."

Practice Book § 27-5 describes the initial interview for nonjudicial handling eligibility and requires that the probation officer inquire of the child and parent or guardian whether they have read the court documents and understand the nature of the complaint.

Practice Book § 27-5 requires that all allegations of misconduct must be explained in simple and nontechnical language, and that the probation officer must inform the parent or guardian of the rights that would be afforded to them if the matter was prosecuted in court, including their right to counsel.

[8] We note that the method employed in the present case to obtain a copy of the evaluation report was not the only route the juvenile probation officer might have employed to access psychological information on Jacklyn. First, if the juvenile probation officer had asked the respondents to consent to her viewing the evaluation report, an agreement may have been reached to

release the information necessary to address her particular need for the information. If the juvenile probation officer was unable to obtain sufficient information, and considered that information necessary to effect a proper nonjudicial supervision, she could have advised the respondents of their right to a court hearing; see Practice Book § 27-8A; or she could have ended the nonjudicial handling, at least temporarily, and requested a judicial hearing. See Practice Book § 27-5 (b). If the probation officer determined that the nature of the alleged misconduct and the absence of psychological information warranted judicial intervention, she also could have recommended that the delinquency matter be placed back on the court's delinquency docket and suggested that another evaluation of Jacklyn be performed. See General Statutes § 46b-134; Practice Book §§ 27-4A (1) (5) and 31a-14.

[9] Prior to oral argument, we requested that the parties be prepared to address whether the holding in *State* v. *Curcio*, 191 Conn. 27, 463 A.2d 566 (1983), permits the present appeal from the court's denial of the respondent's revised motion for order, an interlocutory order, because the order "terminates a separate and distinct proceeding" or "will not impact directly on any aspect of the [main] action." (Internal quotation marks omitted.) *Niro* v. *Niro*, 314 Conn. 62, 68, 100 A.3d 801 (2014). At oral argument, both parties indicated that the order meets the first prong of the *Curcio* test, and we agree. Here, the respondent challenges on appeal the disclosure of the evaluation report to Jacklyn's probation officer, who had no role in the neglect proceedings. We note that the disclosure of the evaluation report should not have any direct impact on the neglect proceedings or the further use of the evaluation report within them, if necessary, while the parents pursue reunification. The proceeding regarding the revised motion for order, which took place after the children's commitments were ordered, is therefore not intertwined with the underlying proceedings on the neglect petitions and, thus, constitutes a separate and distinct proceeding under *Curcio*'s first prong. Further, the proceeding concerning disclosure pursuant to § 46b-124 was terminated when the trial court denied the respondent's revised motion for order and allowed the juvenile probation officer to retain the evaluation report.

[10] On May 7, 2015, the Judicial Branch filed a motion with this court seeking permission to intervene and to appear as an appellee in defense of its interests in this appeal. This court granted the motion on June 29, 2015.

[11] We note that this case does *not* involve a court's ordering the use of the protected information after such information was subjected to a subpoena issued by a party, which might implicate one of the exceptions to disclosure without a person's consent under certain federal and state confidentiality statutes. In the present case, the respondent was induced to consent to the release of this information, and it is the nature of both the inducement and the consent that are at issue.

[12] General Statutes § 46b-124 (b) provides in relevant part: "All records of cases of juvenile matters . . . except delinquency proceedings, or any part thereof . . . shall be confidential and for the use of the court in juvenile matters, and open to inspection or disclosure to any third party, including bona fide researchers commissioned by a state agency, only upon order of the Superior Court, except that: (1) Such records shall be available to . . . (E) employees of the Judicial Branch who, in the performance of their duties, require access to such records . . . ."

[13] On October 27, 2015, we ordered the parties to file simultaneous supplemental briefs addressing whether the participants in the psychological evaluation were entitled to notice and a hearing before the evaluation report was disclosed to the juvenile probation officer in light of the fact that the order for the evaluation dated October 7, 2014, states, at the bottom of page 2, "Evaluation reports and portions of report are confidential and may not be further disclosed without a Court Order."

[14] Although the word "confidential" is used in the title of the statutes protecting communications between a social worker and a professional counselor, the statutes employ the use of the word "privileged" throughout the text and clearly intend privileged status. See General Statutes § 52-146p (b); see also General Statutes § 52-146q (a) (5); General Statutes § 52-146s (b) and (c) (1); C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 5.49, pp. 298–300; Id., § 5.58, pp. 305–307.

[15] For example, consent is not required from the patient if a psychologist suspects child abuse, elderly abuse or abuse of a disabled individual; see General Statutes § 52-146c (c) (4); but no such exception exists for a psychiatrist who might suspect such abuse under § 52-146f. For a broader discussion of the comparative inconsistencies in the various statutorily-created privi-

leges and exceptions to them, see C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) §§ 5.44 through 5.59, pp. 284–308.

[16] We note that the Department of Children and Families' social study was marked as a full exhibit at the time the parents pleaded nolo contendere to the neglect allegations and the disposition of commitment was ordered, presumably by agreement, as there was no trial. There was no similar treatment of the evaluation report.

[17] In a footnote, our Supreme Court in *Bieluch* noted that General Statutes § 52-146f (4) delineated an exception to the requirement of consent, permitting disclosure at a judicial or administrative proceeding of communications made to or records made by a psychiatrist in the course of a psychiatric examination ordered by the court, provided the court finds that the patient has been informed before making the communications that any communications will not be confidential and provided the communications shall be admissible only on issues involving the patient's mental condition. *Bieluch* v. *Bieluch*, supra, 190 Conn. 817 n.2. This exception is similar, but not identical, to the exception contained in § 52-146c (c) pertaining to the disclosure of court-ordered psychological evaluation reports.

[18] "It is axiomatic that any child protection court file can contain myriad 'highly personal information,' including . . . psychological examinations of parents and/or children, which have been generated for the exclusive purpose of promoting family integrity, and with the intention of maintaining confidentiality for the process." *In re James C.*, Superior Court, judicial district of Waterbury, Juvenile Matters, Docket Nos. U06-CP-10007295-A, U06-CP-10007296-A (*Rubinow, J.*) (December 6, 2011).

[19] The parties allege that the respondents and their children were ordered to sign a release allowing the mental health, medical, and counseling professionals who had treated the respondent parents and their children to release protected health information to the evaluator. Further, the parties allege that at least one respondent parent actually did sign such a release, which was compliant with HIPAA. Although the parties make reference to this release, the record does not otherwise reveal that any such release was signed. Thus, we only can surmise as to whether any release actually was signed, let alone the nature and extent of it.

[20] We need not address the issue pertaining to the alleged violation of the respondent's and the children's constitutional rights of privacy because the second issue is dispositive of the present appeal and we "do not engage in constitutional analysis if a nonconstitutional basis upon which to resolve an issue exists." *Shelton* v. *Statewide Grievance Committee*, 277 Conn. 99, 107, 890 A.2d 104 (2006); accord *State* v. *McCahill*, 261 Conn. 492, 501–502, 811 A.2d 667 (2002); *State* v. *Cofield*, 220 Conn. 38, 49–50, 595 A.2d 1349 (1991). We note, however, that at least in the context of the psychiatrist-patient relationship, we previously have held that that relationship is not protected by a constitutional right to privacy. See *Falco* v. *Institute of Living*, 50 Conn. App. 654, 662–64, 718 A.2d 1009 (1998), rev'd on other grounds, 254 Conn. 321, 757 A.2d 571 (2000).

[21] The releases signed for access to mental health treatment communications and records would need to be compliant with HIPAA, which includes detailed recommendations on standards with respect to the privacy of individually identifiable health information. Subsequent to its passage, the federal Department of Health and Human Services promulgated final regulations containing such standards. Authorizations used for a patient's consent under HIPAA must be in writing and contain specific language regarding the information to be disclosed or used, the person(s) disclosing and receiving the information, the expiration of the authorization, the patient's right to revoke in writing, and other data. 45 C.F.R. § 164.508 (c). In every release, a covered entity must make reasonable efforts to use, disclose, and request only the minimum amount of protected health information needed to accomplish the intended purpose of the use, disclosure, or request. See id., § 164.514 (d). HIPAA is normally preemptive of state laws that are contrary to its provisions and any regulations promulgated under it, but state laws that relate to the privacy of individually identifiable health information are exempted from preemption, provided that they are more stringent than a standard, requirement, or implementation specification set forth by HIPAA. See 42 U.S.C. § 1320d-7 (a); 45 C.F.R. §§ 160.202 and 160.203 (b); see also *Byrne* v. *Avery Center for Obstetrics & Gynecology, P.C.*, 314 Conn. 433, 448–50, 102 A.3d 32 (2014) (discussing HIPAA's preemptive effect on state law and state laws that are exempted from such effect). In reviewing the scope of the consent provided by the releases signed by the parents, upon remand, the court will need to compare the disclosure restrictions and exceptions in the applicable state privilege statutes and in § 46b-129 (b) (1) (E), with the restrictions and exceptions in HIPAA and its regulations in order to determine which law, state or federal, is more restrictive and, therefore, controls. The specific HIPAA exceptions related to the disclosure

of protected health information without a consent in judicial and administrative proceedings is contained in 45 C.F.R. § 164.512 (e).

[22] We do not address issues concerning the educational information disclosed by the children's school principal to the evaluator pertaining to Jillian and Jacklyn because the respondent has made no privacy claim with respect to educational information. We note, however, that the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, contains provisions relating to the confidentiality of educational records, and except as disclosure of confidential student information is otherwise authorized in FERPA, school districts must have written consent of the parent before confidential student information is disclosed. The federal regulations promulgated under FERPA require that such consent specify the records that may be disclosed, the purpose of the disclosure, and the party to whom the records are to be disclosed. See T. Mooney, A Practical Guide to Connecticut School Law (3d Ed. 2002) c. 4, p. 292.

[23] We recognize that the present appeal brought by the respondent may, at first glance, appear to be moot on the ground that there is no practical relief that this court can afford him in light of the fact that copies of the evaluation report already have been disclosed to the juvenile probation officer. Although the Judicial Branch indicated during oral argument to this court that the nonjudicial supervision of Jacklyn is completed, possibly concluding the probation officer's need for further use of the evaluation report, the Judicial Branch has not raised the issue of mootness.

Nevertheless, even if the issue had been raised, we would not conclude that the appeal is moot because the respondent seeks practical relief by way of an order that any copies of the evaluation report in the possession of the juvenile probation office be returned to the child protection file or destroyed. In addition, we further conclude that the appeal is not moot because it raises an issue that is capable of repetition, yet evading review. See *Karp* v. *New Britain*, 57 Conn. App. 312, 316 n.8, 748 A.2d 372 (2000) (moot appeal may nevertheless be heard under exception that issues raised therein are capable of repetition, yet evading review); see also *Loisel* v. *Rowe*, 233 Conn. 370, 377–83, 660 A.2d 323 (1995) (discussing "capable of repetition, yet evading review" doctrine in Connecticut).

In analyzing whether we can still afford practical relief, we consider three factors identified in *Delevieleuse* v. *Manson*, 184 Conn. 434, 437, 439 A.2d 1055 (1981); see also *Loisel* v. *Rowe*, supra, 382. First, we find that the issue here raises a matter of public importance, the protection of private mental health information. In addition, given the short duration of the nonjudicial supervision, which cannot exceed six months, the issue of the probation officer's possession of the evaluation report was so short as to evade review, and finally, the respondent and his children are likely to be affected in the same manner again. Section 46b-124 (b) (1) (E) sets no limitations as to the length of time that such records are subject to disclosure, nor does it limit the disclosure to records pertaining only to the actual subject of the juvenile proceeding. The statute permits, without the necessity of a court order, widespread dissemination of child protection records to employees of the Division of Criminal Justice, Judicial Branch employees, other courts, the Department of Children and Families, and the probate courts. In addition, as the evaluation report in the present case is now part of Jacklyn's delinquency record, § 46b-124 (d) may permit further disclosure to employees and authorized agents of state or federal agencies involved in delinquency proceedings, the provisions of services directly to the child or the delivery of court diversionary programs, school officials, law enforcement officials and prosecutorial officials conducting legitimate criminal investigations. Furthermore, if any of the participants are convicted of a crime in the future and there is a need for risk assessment, members and employees of the Board of Pardons and Paroles and employees of the Department of Correction may obtain the evaluation report.